Filed 7/17/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>XENG SAETERN,<br><br>    Defendant and Appellant. | C066929<br><br>(Super. Ct. No. 06F01200) |

APPEAL from a judgment of the Superior Court of Sacramento County, Roland L. Candee, Judge.  Affirmed.

Philip M. Brooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French, Daniel B. Bernstein, and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

In a succession of cases beginning with *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825] (*Graham*), followed by *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407] (*Miller*), and concluding with *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the United States and California Supreme Courts explored the constitutional limits of government's power to punish minors tried as adults.  Responding

1

to these decisions, the California Legislature enacted Senate Bill No. 260, adding section 3051 to the Penal Code,[1] which provides minors sentenced to a determinate term of years or a life term an opportunity to prove their rehabilitation and secure release on parole after serving a prescribed term of confinement.

We consider the principles articulated in *Graham*, *Miller*, *Caballero*, and their progeny, and the provisions of section 3051, in this appeal brought by Xeng Saetern, who is serving a 100-years-to-life sentence for a murder he committed at age 14. Saetern insists that in imposing a sentence that is the functional equivalent of life without possibility of parole, the trial court failed to consider the factors of youth set forth in *Miller* and thus a remand for resentencing is required. According to respondent, consideration of the factors articulated in *Miller* is only required where a minor's sentence, even as modified by a later legislative enactment, is life without possibility of parole or the functional equivalent thereof. Respondent insists that Senate Bill No. 260, which enacted section 3051, resolved any constitutional infirmity in the sentencing procedure by effectively reducing defendant's sentence to one offering the possibility of parole after 25 years.

The question of whether section 3051 has the effect urged by respondent is pending before the California Supreme Court; ultimately, Saetern's arguments and his fate will be resolved by the higher court. Conscious of the ephemerality of our decision and that we are writing on shifting sands, we conclude that even assuming the trial court's sentencing process failed to comport with the requirements of *Miller*, the violation was rendered harmless with the enactment of section 3051, which affords Saetern more favorable relief than the sentencing court could provide.

---

[1] Undesignated statutory references are to the Penal Code.

**FACTS**

The facts surrounding the shooting are undisputed. Nai Saechao recruited his cousin, Khae Saephan, to kill Nai's wife, Si Saeturn. Neither Nai nor his lover, Mimi Le, was present at the time of the murder. On December 29, 2005, Khae, Lo Fou Saephanh, and the 14-year-old shooter, defendant Xeng Saetern, drove to Si's place of employment and waited until she got off work. The young marksman walked down to the victim's car and shot her in the head and abdomen at close range while the other two waited in their car. Si and her four-month-old fetus died at the scene. (Facts from our earlier opinion, *People v. Le* (Apr. 22, 2011, C057217 & C057150) [nonpub. opn.].)[2]

Xeng confessed to the shooting. He did not know why anyone wanted the lady killed.

Codefendant Khae testified in his own defense. Despite the fact that during several interrogations he repeatedly denied shooting the victim, at trial he claimed that he, not Xeng, was the shooter. He purportedly told Xeng to admit he had shot the victim because Xeng was a juvenile and therefore would get less time. Khae told the jury he threatened to shoot Xeng and his parents if he did not "take the rap." Xeng complied.

The jury rejected the defense. The trial court sentenced Xeng to two terms of 25 years to life for each of the two murder convictions (§ 187, subd. (a)) and consecutive terms of 25 years to life for each of the two firearm enhancements (§ 12022.53, subd. (d)), for a total of 100 years to life in state prison. The court stayed execution of the 25-years-to-life sentence imposed for conspiracy to commit murder. (§ 654.)

---

[2] Since several individuals share the same or similar surnames, we shall refer to the parties and others by their first names for clarity and ease of reference. No disrespect is intended.

## DISCUSSION

## I.  JUVENILE LWOP AND ITS LIMITATIONS:  CASES AND STATUTES

Three court decisions and a statute provide the guiding light that will control our disposition of this appeal.  In *Graham*, the United States Supreme Court held that the Eighth Amendment to the Constitution prohibits the imposition of a sentence of life without parole (LWOP) on a juvenile for any crime other than homicide.  (*Graham*, *supra*, 560 U.S. 48 [176 L.Ed.2d 825].)  Thereafter, in *Miller*, heard and decided with a related case from Arkansas, *Jackson v. Hobbs*, the Supreme Court held that states cannot impose "mandatory life-without-parole sentences for juveniles" (*Miller*, *supra*, 567 U.S. ___ [183 L.Ed.2d at p. 418]) but permitted the imposition of LWOP on juveniles convicted of murder following an "individualized sentencing" (*id*. at p. ___ [183 L.Ed.2d at p. 414]) that takes into account "how children are different" (*id*. at p. ___ [183 L.Ed.2d at p. 424]).  More specifically, "The high court noted that such mandatory sentences preclude consideration of juveniles' chronological age and its hallmark features–among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surround them–no matter how brutal or dysfunctional.  ([*Miller*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 423].].)  Thus, in *Miller* the high court did 'not foreclose a sentencer's ability' to determine whether it was dealing with homicide cases and the ' "rare juvenile offender whose crime reflects irreparable corruption." ' (*Id*. at p. ___ [[183 L.Ed.2d at p. 424], quoting *Roper* [*v. Simmons* (2005)] 543 U.S. [551,] 573 [. . . 161 L.Ed.2d 1];; see *Graham*, *supra*, 560 U.S. at [pp. 67-68] [176 L.Ed.2d at p. 841].)" (*Caballero*, *supra*, 55 Cal.4th at p. 268, fn. 4.)

*Miller* invalidates LWOP sentences where such a penalty is mandatory and imposed without respect to consideration of the background or age of the offender.  Conversely, a sentence of LWOP resulting from "individualized sentencing" is permissible.  And what is "individualized sentencing?"  The clearest description is set

forth in the *Miller* court's own summary of its holding: "To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features--among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him--and from which he cannot usually extricate himself--no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth--for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller*, *supra*, 567 U.S. at p. __ [183 L.Ed.2d at p. 423].)

Our Supreme Court in *Caballero* described the *Miller* holding thusly: "The [*Miller*] court requires *sentencers in homicide cases* 'to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' (*Miller*, *supra*, 567 U.S. at p. ___ [[183 L.Ed.2d at p. 424]].)" (*Caballero*, *supra*, 55 Cal.4th at p. 268, fn. 4, italics added.)

However, *Caballero* was not a homicide case. It involved a 110-years-to-life sentence imposed on a 16-year-old defendant convicted of attempted murder and the categorical bar on LWOP imposed by *Graham* in nonhomicide cases. *Miller* was cited for the proposition that the *Graham* bar applies to "all *nonhomicide cases* involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a life without parole sentence . . . ." (*Caballero*, *supra*, 55 Cal.4th at p. 268, italics added.) The court concluded that "*Graham*'s analysis does not focus on the precise sentence meted out. Instead, as noted above, it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during

his or her expected lifetime.  (*Graham*, *supra*, 560 U.S. at p. [82] [[176 L.Ed.2d at p. 850]].)"  (*Caballero*, at p. 268.)[3]  The court encouraged legislative action:  "We urge the Legislature to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity."  (*Id*. at p. 269, fn. 5.)

While this appeal was pending, the Legislature heeded the advice of the Supreme Court and enacted Senate Bill No. 260.[4]  The measure finds "that, as stated by the United States Supreme Court in *Miller*[, *supra*, 567 U.S. ___] 183 L.Ed.2d 407, 'only a relatively small proportion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior,' and that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' including 'parts of the brain involved in behavior control.'  The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society.  The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in [*Caballero*] and the decisions of the

---

[3]  The court in *Caballero* indicated that " 'life expectancy' means the normal life expectancy of a healthy person of defendant's age and gender living in the United States."  (*Caballero*, *supra*, 55 Cal.4th at p. 267, fn. 3.)

[4]  At our request, the parties submitted supplemental briefs regarding the application of the measure to the present appeal.

6

United States Supreme Court in [*Graham*] and [*Miller*]." (Sen. Bill No. 260 (2013-2014 Reg. Sess.) ch. 312, § 1, pp. 2-3.)[5]

Senate Bill No. 260, codified as section 3051, provides an opportunity for a juvenile offender to be released on parole irrespective of the sentence imposed by the trial court by requiring the Board of Parole Hearings to conduct "youth offender parole hearings" (Sen. Bill No. 260 (2013-2014 Reg. Sess.) ch. 312, § 4, p. 7) to consider the release of juvenile offenders sentenced to prison for specified crimes.[6] It provides for a youth offender parole hearing during the 15th year of incarceration for a prisoner serving a determinate sentence (§ 3051, subd. (b)(1)), a hearing during the 20th year of incarceration for a prisoner serving a life term less than 25 years to life (§ 3051, subd. (b)(2)), and a hearing during the 25th year of incarceration for a prisoner serving a life term of 25 years to life (§ 3051, subd. (b)(3)). Section 3051, subdivision (d) requires the Board of Parole Hearings to "conduct a youth offender parole hearing to consider release." Section 3051, subdivision (f)(1) requires that any psychological evaluations and risk assessment instruments be administered by a licensed psychologist employed by the board and that the evaluations and instruments "take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual."

---

[5] Earlier, the Legislature enacted amendments to section 1170 that became effective January 1, 2013. (Stats. 2013, ch. 508, § 5.) Subject to exceptions not relevant here, section 1170, subdivision (d)(2) retroactively permits a defendant who was sentenced to LWOP for a crime committed as a juvenile to petition the court for recall and resentencing after serving at least 15 years of that sentence. Defendant was not sentenced to LWOP, and therefore section 1170, subdivision (d)(2) does not apply by its terms to his sentence.

[6] The measure exempts from its provisions inmates who were sentenced pursuant to the three strikes law (§§ 667, subds. (b)-(i), 1170.12), the Chelsea King Child Predator Prevention Act of 2010 (formerly and more commonly known as Jessica's Law) (§ 667.61), or "to life in prison without the possibility of parole" (§ 3051, subd. (h)).

7

So, to summarize:

1.  A sentence of LWOP cannot be imposed on a juvenile defendant for a nonhomicide offense.

2.  A mandatory sentence of LWOP cannot be imposed on a juvenile defendant for any offense.

3.  A discretionary LWOP sentence can be imposed on a juvenile defendant for a homicide offense provided the sentencing takes into account the factors described in the *Miller* case that make children different for sentencing purposes.

4.  In California, the bar on limitations on juvenile LWOP sentences applies to sentences for a term of years that is the functional equivalent of an LWOP sentence; a juvenile defendant must be provided with a realistic opportunity to obtain release during the juvenile's expected lifetime.

5.  Under section 3051, juveniles who qualify are afforded a periodic opportunity for release on parole regardless of the sentence imposed.

## II.  XENG'S SENTENCE AND THE EFFECT OF SECTION 3051

### A.  The sentence is not a mandatory LWOP sentence.

Xeng was convicted of murder and thus the categorical bar on LWOP punishment imposed by *Graham* does not apply.  The sentence imposed by the trial court was not by its terms an LWOP sentence, and thus the principles of *Miller* are pertinent only if we apply our Supreme Court's reasoning in *Caballero*, a nonhomicide case, to the sentence imposed here.  Xeng urges us to do so and argues that his sentence violates *Miller* because at least 75 of the 100 years the court imposed are mandatory.

He calculates his sentence as follows:  the court had the option to impose consecutive or concurrent sentences for each of the two counts of murder.  Pursuant to section 12022.53, former subdivision (d), however, each of the enhancements must be served consecutively:  "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or

8

(d) of section 12034, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

There is no question that the court must order an enhancement pursuant to section 12022.53, former subdivision (d) to run consecutively to the underlying count. But we disagree with Xeng that the entire sentence (the count plus the enhancement) cannot run concurrently to other counts, including the enhancements applicable to those counts. In *People v. Oates* (2004) 32 Cal.4th 1048, 1060, the Supreme Court observed: "[A]s the People note, a trial court can mitigate concerns about sentencing inequities by imposing concurrent, rather than consecutive, sentences where multiple subdivision (d) enhancements are found true." Thereafter, the court upheld concurrent sentencing in the factually analogous case, *People v. Smith* (2005) 37 Cal.4th 733 (*Smith*).

In *Smith*, the defendant was convicted of the attempted murder of a mother and her baby, having fired one shot into the car in which they were traveling. (37 Cal.4th at p. 736.) Because the bullet missed the mother and child, the enhancement for discharging a firearm set forth in section 12022.53, subdivision (c) was found true. (*Smith*, at p. 738.) Subdivision (c), like former subdivision (d) of section 12022.53, states that the enhancement must run consecutively. The trial court imposed the middle term of seven years for the attempted murder of the mother, with a consecutive 20-year term for the firearm enhancement, to be served concurrently with an identical 27-year combined term for the attempted murder of the baby and the accompanying firearm enhancement. (*Smith*, at p. 738.) Both the Court of Appeal and the Supreme Court affirmed the sentence. (*Id*. at p. 736.)

According to the Supreme Court, therefore, Xeng's maximum mandatory sentence was 50, not 75, years. Xeng's threshold proposition that he was subject to a mandatory

9

sentence of 75 years, which constitutes cruel and unusual punishment under a *Miller*/*Caballero* analysis, is not supportable.

**B.  Xeng's eligibility for parole consideration under section 3051 and its consequences.**

Xeng asserts that he does not fall within the ambit of section 3051 because he was sentenced to a life term with a minimum greater than 25 years.  Not so.  Defendant is eligible even though his aggregate term is 100 years to life in prison because, pursuant to section 3051, subdivision (b)(3), any of his four 25-years-to-life sentences can serve as the "controlling offense" and the new parole eligibility scheme is based on the sentence for the controlling offense.  Thus, he will be eligible for a youth offender parole hearing once he serves one of his 25-years-to-life sentences.

The youth offender parole hearing to which Xeng is entitled will provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" as discussed by the United States and California Supreme Courts.  (*Graham*, *supra*, 560 U.S. at p. 75 [176 L.Ed.2d at pp. 845-846]; see *Miller*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 424]; see also *Caballero*, *supra*, 55 Cal.4th at p. 266.)  The question, however, is whether this legislative remedy corrects the constitutional violation in sentencing alleged here.  Justice Werdegar, who wrote in *Caballero* "that the Legislature is an appropriate body to establish a mechanism to implement *Graham*'s directives for the future" (*Caballero*, at p. 273, conc. opn. of Werdegar, J.), nonetheless opined:  "But irrespective of whether the Legislature, in the future, steps in to enact procedures under which juveniles in defendant's position may be resentenced, the trial court in this case must resentence defendant to a term that does not violate his rights. . . .  *Graham* does not require defendant be given a parole hearing sometime in the future; it prohibits a court from sentencing him to such a term lacking that possibility at the outset" (*ibid*).  No other justice concurred in her views.  Our colleagues in other districts have put forth conflicting opinions, most of which have been

10

granted review and thus are not authority that we can rely on here.  (See *In re Alatriste* (2013) 220 Cal.App.4th 1232, review granted Feb. 19, 2014, S214652; *People v. Martin* (2013) 222 Cal.App.4th 98, review granted Mar. 26, 2014, S216139; *In re Heard* (2014) 223 Cal.App.4th 115, review granted Apr. 30, 2014, S216772; *People v. Franklin* (2014) 224 Cal.App.4th 296, review granted June 11, 2014, S217699.)

Two appellate court decisions remain viable, *People v. Gonzalez* (2014) 225 Cal.App.4th 1296 and *People v. Garrett* (June 30, 2014, C067436, C069886) ___ Cal.App.4th ___ [2014 Cal.App. Lexis 575] (*Garrett*).  In *Gonzalez*, the court noted that section 3051 "affords Gonzalez a substantial parole period outside prison if he demonstrates reform, even under the earliest end-of-life projections.  Consequently, Gonzalez's incarceration, although lengthy and under a mandatory sentence, does not implicate *Miller*'s per se ban on mandatory LWOP terms for juveniles.  He similarly falls outside *Caballero*'s holding that de facto LWOP terms may be tantamount to an LWOP for constitutional purposes.  Simply put, under the new legislation, Gonzalez does not face the prospect of LWOP.  Therefore, *Miller* does not apply, and neither does *Caballero*'s recognition that a lengthy term of years may amount to an LWOP sentence." (*Gonzalez,* at p. 1309.)  The same could be said here of Xeng's future prospects and supports the Attorney General's position that because Xeng is provided some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation, his sentence is not the functional equivalent of an LWOP sentence.

Xeng disagrees.  He insists that the United States Supreme Court rejected the notion that the possibility of relief in the future cures an unconstitutional sentence.  He reminds us that *Miller* and *Graham* instruct that a child is constitutionally entitled to individualized sentencing at the outset. (*Miller*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at pp. 429-430]; *Graham*, *supra*, 560 U.S. at pp. 77-78 [176 L.Ed.2d at p. 847].)  Where *Miller* is applicable, "the state may not deprive [juvenile offenders] at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society

11

in the future." (*Caballero*, *supra*, 55 Cal.4th at p. 268.) More to the point, he argues that the new legislation does not abrogate the court's responsibility to impose a proportionate sentence by taking account at the time of sentencing of the diminished culpability of young offenders.

Even if we accept Xeng's argument that a post facto remedy cannot cure a past constitutional error, here the error has been rendered harmless by the Legislature's action. We are confronted here with the practical, and dispositive, fact that the new sentencing hearing defendant urges us to compel cannot provide him any more favorable relief than does the new legislation. Under California law, defendant faced a mandatory prison sentence of 25 years to life for each murder, increased by a mandatory 25 years to life for each gun enhancement. If we remand the case for resentencing as defendant requests, the sentencing court's only discretion would be to order concurrent, rather than consecutive, 50-years-to-life terms, meaning that defendant would not be eligible for parole until he had served 50 years in prison. But with the benefit of section 3051, defendant will be eligible for parole after 25 years of incarceration. Even if he is denied parole at his first youth offender parole hearing in 25 years, section 3051 provides for additional hearings. Section 3051, subdivision (g) provides, in part: "If parole is not granted, the board shall set the time for a subsequent youth offender parole hearing in accordance with paragraph (3) of subdivision (b) of Section 3041.5. In exercising its discretion pursuant to paragraph (4) of subdivision (b) and subdivision (d) of Section 3041.5, the board shall consider the factors in subdivision (c) of Section 4801."

We acknowledge the support provided Xeng's argument by *Garrett*, *supra*, ___ Cal.App.4th ___ [2014 Cal.App. Lexis 575], a recent decision by another panel of this court. Garrett, age 17 at the time he committed the offenses of robbery, kidnapping for robbery, attempted robbery, and assault with a firearm, was sentenced to serve a total of 74 years 4 months to life in prison for the offenses and associated firearm enhancements. (*Id*. at p. ___ [2014 Cal.App. Lexis at pp. *1-*2].) There, as here, the

12

Attorney General argued the parole opportunities afforded by section 3051 provide all that *Caballero* requires, viz.: a realistic opportunity for Garrett to obtain release from prison during his lifetime. (*Garrett*, at p. ___ [2014 Cal.App. Lexis at p. *21].) The *Garrett* court disagreed. The constitutional analysis set forth in the *Garrett* opinion largely mirrors our own. (*Id.* at p. ___ [2014 Cal.App. Lexis at pp. *24-*25].) *Garrett*'s account of what the cases hold is correct, but those holdings were in factual and legal contexts far different from the present case. Neither *Graham*, *Miller*, nor *Caballero* address what an appellate court should do when a defendant is afforded a better deal under an ameliorative statute like section 3051 than he could possibly obtain on remand to the trial court for a new sentencing hearing.

*Garrett* discusses *People v. Gutierrez* (2014) 58 Cal.4th 1354, but *Gutierrez* sheds little light on the issues involved here. *Gutierrez* involved a juvenile defendant sentenced to LWOP under section 190.5 (*Gutierrez*, at p. 1360) and a statute, section 1170, subdivision (d)(2), that permits him to seek recall and modification of the sentence in the future (*Gutierrez*, at pp. 1384-1385). A pivotal issue in the case is the constitutionality of section 190.5, a statute construed as creating a presumption in favor of LWOP for 16- or 17-year-old juveniles who commit special circumstance murder. In explaining why section 1170 does not cure the constitutional issue resulting from construing section 190.5 as creating a presumption, the court declared: "But even for juvenile offenders such as Gutierrez, the potential for relief under section 1170[, subdivision] (d)(2) does not eliminate the serious constitutional doubts arising from a presumption in favor of life without parole under section 190.5[, subdivision] (b) because the same questionable presumption would apply at resentencing. The statute makes clear that if the sentencing court grants an inmate's petition for a resentencing hearing, the hearing must be conducted 'in the same manner as if the defendant had not previously been sentenced.' (§ 1170, subd. (d)(2)(G).) Thus, if section 190.5[, subdivision] (b) establishes a presumption in favor of life without parole, a court acting pursuant to

13

section 1170, subdivision (d)(2)(G) would be required to apply the same presumption in evaluating the circumstances at resentencing (only this time, unlike at the initial sentencing, the defendant would have no guarantee of counsel)." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1385.)

One may be tempted to treat sections 1170 and 3051 the same and to apply the same constitutional analysis to both as they each provide a form of relief to juvenile defendants sentenced to extended prison terms, but that would be a mistake. Unlike section 3051, which makes a defendant eligible for parole consideration after 25 years, section 1170 merely permits a defendant to petition for recall and resentencing before the same court. The *Garrett* panel failed to appreciate the difference between the two statutory schemes, and the difference between the two cases. After repeating the standard incantation regarding the need for the sentencing court to consider the factors of youth, the panel reached the sweeping conclusion: "In short, the California Supreme Court recognized a statutory promise of future correction of a presently unconstitutional sentence does not alleviate the need to remand for resentencing that comports with the Eighth Amendment." (*Garrett*, *supra*, ___ Cal.App.4th at p. ___ [2014 Cal.App. Lexis at pp. *28-*29].) The Supreme Court may well reach such a conclusion in the future, and the *Garrett* panel may have correctly discerned where the court is headed on this issue. But read in context, against the background of prior decisions and accepting the language of the opinion as written, the Supreme Court simply recognized that a statute violating *Miller*'s bar against mandatory LWOP sentences cannot be saved by affording a defendant the right to petition for a new sentencing hearing before the same court applying the same sentencing standards.

It is difficult to understand, and the *Garrett* panel does not explain, how a defendant who has been given a right to parole consideration by the Legislature under section 3051 is in any worse position than a defendant whose right to parole consideration derives from a sentence imposed by a trial court following review of the

14

multiple factors set forth in *Miller*. *Garrett*'s holding suggests that no action taken by the Legislature to reduce the severity of a sentence imposed on a juvenile and, one would surmise, no act of clemency by the Governor could obviate the need to remand a case to the trial court for a new sentencing hearing–even though the outcome of the hearing would be less favorable than the punishment as modified by statute or executive action. We decline to decree such an outcome and conclude section 3051 has the effect of rendering Xeng's sentence as one that includes the right to parole consideration after 25 years. As such, any *Miller* violation was rendered harmless with the enactment of section 3051, which affords Xeng more favorable relief than any that could be provided by this court.

### III.  THE IMPLICATIONS OF *PEOPLE V. DILLON*

Relying on the extraordinary facts of *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*), defendant makes the radical request that we order the trial court to ignore the statutory sentencing scheme if necessary to comport with *Miller*. But *Miller* is much more humble in its aspirations than defendant appreciates, and he strays far from both the holding and the spirit of *Miller* in suggesting we encourage a trial court to ignore the Legislature's sentencing regimen in the name of individualized sentencing. His argument need not detain us long.

As a fundamental attribute of the separation of powers, it is the legislative, and not the judicial, branch that is imbued with the responsibility to design a comprehensive sentencing scheme for those offenders who break the social contract and violate our criminal laws. (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1086.) We can find nothing in *Miller* at odds with this fundamental principle. Indeed, *Miller* itself eschewed the more aggressive opportunity it had to declare that all mandatory LWOP sentences for homicides committed by juveniles are categorically unconstitutional under the Eighth Amendment. The court concluded: "We therefore hold that the *Eighth Amendment* forbids a sentencing scheme that mandates life in prison without possibility of parole for

15

juvenile offenders. . . . Because that holding is sufficient to decide these cases, we do not consider Jackson's and Miller's alternative argument that the *Eighth Amendment* requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger." (*Miller*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 424].)

Nor does an outlier like *Dillon* justify wholesale dismantling of a statutory sentencing scheme under the guise of the Eighth Amendment. We recognize that the California Supreme Court took the unusual step of reducing a juvenile's first degree murder conviction to second degree murder based on a unique combination of facts clearly demonstrating diminished culpability with the vagaries of the felony murder rule. But none of those anomalies are present here. Simply put, the circumstances of the murders defendant committed are not clouded by any of the factors that reduced Dillon's culpability. If, as *Miller* advises, defendant's culpability should be diminished because of his age and attendant misfortunes, it is only in the context that a Legislature cannot mandate he spend his natural life in prison without the opportunity to demonstrate that he no longer poses a threat to society. Because California does not mandate life terms without the possibility of parole and section 3051 provides defendant with a meaningful opportunity to obtain parole, defendant was not harmed by any claimed constitutional violation.

## DISPOSITION

The judgment is affirmed.

                    RAYE            , P. J.

We concur:


      NICHOLSON      , J.


      DUARTE         , J.

16